IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| THOMAS E. PEREZ, SECRETARY OF LABOR, U.S. DEPARTMENT OF LABOR, )<br><br>Plaintiff, )<br><br>v. )<br><br>LI YING LI AND JIAN YUN ZHENG, individually; KING BUFFET OF IA, INC. d/b/a KING BUFFET; KING BUFFET OF AMES, INC.; BUFFET MONGOLIAN GRILL, INC. d/b/a MONGOLIAN BUFFET; and STEAK BUFFET, INC., )<br><br>Defendants. ) | Case No. 15-136<br><br><br><br><br><br><br><br><br>**REPLY TO PLAINTIFF'S RESISTANCE TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................2

STATEMENT OF FACTS ......................................................................................3

    A.    THE DEPARTMENT CONCLUDED EVERY CHINESE EMPLOYEE LIED. ....................................................................................................3

    B.    THE DEPARTMENT HAS NO BASIS FOR ITS CONCLUSION ALL CHINESE EMPLOYEES LIED. .............................................................5

        1.    Investigator Gonzalez Claimed Chinese Employees Contradicted the Records; They Did Not. .............................................................5

        2.    Investigator Gonzalez Claimed Surveillance Supported Her Conclusions; It Does Not. ........................................................7

        3.    Investigator Gonzalez Claimed Interviews Supported Her Conclusions; They Do Not. ...........................................................10

    C.    THE DEPARTMENT'S FACTUAL STATEMENT IS MISLEADING. ............13

    D.    THE DEPARTMENT'S INVESTIGATION NEGATES ITS CONCLUSIONS. ..................................................................................17

ARGUMENT..................................................................................................21

I.      THERE IS NO BASIS TO DENY SUMMARY JUDGMENT BASED ON
        UNAUTHENTICATED DOCUMENTS. .........................................................23

II.     THERE IS NO BASIS TO STRIKE AFFIDAVITS FROM THE
        DEPARTMENT'S OWN WITNESSES. .........................................................24

III.    THE DEPARTMENT IGNORES SUMMARY JUDGMENT STANDARDS AND
        RULES..........................................................................................................27

        A.  Immaterial Allegations Do Not Defeat Summary Judgment.......................28

        B.  Alleging Two Chinese Employees Lie Does Not Show All Chinese
            Employees Lie. ......................................................................................29

        C.  The Government's Failure to Secure Evidence Is Not Evidence. ...............30

        D.  The Department May Not Invoke Witnesses Lacking Personal
            Knowledge. ...........................................................................................31

        E.  Claiming Evidence Will Someday Materialize Is Anathema to Summary
            Judgment. ..............................................................................................32

        F.  Generalizations Do Not Overcome Evidence. ..........................................33

IV.     THE DEPARTMENT CANNOT SIMPLY DECIDE TO DENY THE TIP
        CREDIT..........................................................................................................35

V.      THE DEPARTMENT APPEARS TO CONCEDE ITS DAMAGES DEMAND
        WENT OUTSIDE THE LIMITATIONS PERIOD...........................................37

CONCLUSION.............................................................................................37

## PRELIMINARY STATEMENT

On June 24, 2016, Defendants sought summary judgment on the Department of Labor's claims on behalf of  Li Rong Chen, Quing Wen Chen, Xiao Qui Chen, Lian Fang Dong, Li Xiang Gao, Ai Mei Li, Jia Rong Li, Ling Quan Li, Sheng Wang Li, Si Tong Li, Xiang Jin Li, Xiu Feng Li, Xue Quin Li, Xue Qin Li, Zeng Xing Li, Zhao Shui Li, Lan Lin, Liang Pan, Ping Wang, Wen Qiang Wang, Di Wu, Bi Jiang Zhang, Qui Ying Zhang, Shi Zhao Zheng and Xiu Ying Zhu.

Because the Department provides no evidence regarding any of these individuals and their lead investigator admits they *all* disagree they are owed money, summary judgment is required.

## STATEMENT OF FACTS

The Department presents a remarkable case seeking recovery for employees who personally insist, consistent with the employer's records, they are *not* owed anything and did *not* work hours the Department claims.   The Department ignores employees' actual testimony regarding their work, actual observations and time records.   Instead, it relies on hearsay and generalizations unsupported by personal knowledge regarding individuals the purported witnesses cannot even identify.   The Department's case is based on a report of Government Investigator Maria Gonzalez that she admits is flawed and just plain wrong.  M. Gonzalez Dep. at. 89 (Supp. App. at 10).   Because Investigator Gonzalez's report and testimony are the crux of the Department's case, they must be examined closely.

### A.   The Department Concluded Every Chinese Employee Lied.

Investigator Gonzalez's report is based on her investigation at King Buffet and Mongolian Grill, operated by Defendant Li Ying Li ("Annie") and Jian Yun Zheng ("Henry") who speak Mandarin Chinese.  (App. at 1, 4).  Investigator Gonzalez has no training interviewing witnesses from different cultures or on cultural sensitivities (M. Gonzalez Dep. at 10 (Supp. App. at 2), but indicates she knows about Mandarin and Chinese people because "I am from New York."  M. Gonzalez Dep. at 11 (Supp. App. at 2).  The investigation involved unannounced "cold calls" to visit restaurant employees.  M. Gonzalez Dep. at 10 (Supp. App. at 2).  Those interviewed had no warning or notice to allow coordinated testimony.  M. Gonzalez Dep. at 157 (Supp. App. at 22). Indeed, at King Buffet, investigators simultaneously entered the front and back doors to ensure nobody left.  (App. at 9)

During these unannounced interviews, the restaurants' employees of Chinese descent were extremely consistent in confirming, like at most restaurants, their schedules mirror times people eat and they are _not_ employed twelve hours a day, six days a week as the Department claims. (App. at 18, 125-44, 180-94, 221-37, 271-85, 314-28, 357-71, 400-14, 443-57, 486-87, 489-94, 507-08, 510-16, 532-58, 602-03, 609-24, 656-72, 708-09, 816, 827, 868-71, 901-04)  This fact remained consistent across the Department's surprise interviews, servers' contemporaneous, signed time records and their signed declarations under oath.  M. Gonzalez Dep. at 150 (Supp. App. at 21).  Despite this, Investigator Gonzalez concluded these employees actually worked six days a week, twelve hours a day because she concludes, quite literally, every single Chinese employee is a liar:

> Q.    And in order for your calculation to be correct, all of the Chinese employees had to have lied; correct?
>
> A.    They told untruths.
>
> Q.    For your calculations to be correct, that has --
>
> A.    Yes.
>
> Q.    -- to be true, that every single Chinese employee lied; correct?
>
> A.    Yes.

M. Gonzalez Dep. at 106 (Supp. App. at 15); _see also_ M. Gonzalez Dep. at 134 (Supp. App. at 20).  Investigator Gonzalez concludes every Chinese employee is not credible—even if she never met them:

> Q.    And, in fact, you rejected the credibility of every Chinese employee; correct?
>
> A.    Correct.

M. Gonzalez Dep. at 124 (Supp. App. at 17).

> Q.    Without ever meeting the person, you don't believe them?
>
> A.    If you're -- Right.

M. Gonzalez Dep. at 124 (Supp. App. at 17).

B.     **The Department Has No Basis for Its Conclusion All Chinese Employees Lied.**

In light of her troubling conclusion that all Chinese employees were lying, Investigator Gonzalez was asked whether Chinese employees provided any basis to conclude they were not credible.  They did not:

> Q.     And you don't know of any reason they'd have to lie about the number of employees in the kitchen, do you?
>
> A.     I don't know the answer.
>
> Q.     And yet you found them not credible?
>
> A.     Yes.

M. Gonzalez Dep. at 126-127 (Supp. App. at 18).

> Q.     But you disregard this employee's statement, nonetheless, despite not knowing any reason they would have to lie to you; correct?
>
> A.     Correct.

M. Gonzalez Dep. at 122 (Supp. App. at 17); *see also* M. Gonzalez Dep. at 131-32 (Supp. App. at 19) ("Q.  Do you know of anything about this person that makes them not credible?  A.  I don't."); M. Gonzalez Dep. at 197 (Supp. App. at 27); M. Gonzalez Dep. at 198-200 (Supp. App. at 28) ("Q.  You don't have any reason to doubt this person's credibility, do you?  A.  I don't know the person…. Q.  And, again, you don't believe this Chinese-speaking employee; correct?  A. Correct.").  Lacking any evidence a single Chinese-speaking employee was not credible, Investigator Gonzalez nonetheless concluded they were all liars.  Investigator Gonzalez's varying explanations for why she assumes every Chinese employee is a liar are disturbing.

> 1.  Investigator Gonzalez Claimed Chinese Employees Contradicted the Records; They Did Not.

First, Investigator Gonzalez claimed Chinese employees' testimony contradicted the records:

> Q.     And you chose to disbelieve what the Chinese employees told you; correct?

> A.     I chose to follow the records.

M. Gonzalez Dep. at 59 (Supp. App. at 5). Far from contradicting records, the Chinese employees'

interviews actually were 100% consistent with the records upon which Investigator Gonzalez

claimed to rely:

> Q.     But, in fact, once you did get those records, it turned out to be remarkably
> consistent what they had said during the interviews, didn't it?
>
> A.     Remarkably, yes.
>
> Q.     And they didn't know you were showing up when they said that, did they?
>
> A.     No.
>
> Q.     In other words, it was a cold call.
>
> A.     Right.

M. Gonzalez Dep. at 157 (Supp. App. at 22).

> **Q.     But I take it you conclude Lan Lin is also being dishonest under oath;
> is that correct?**
>
> **A.     Based on the records, yes.**
>
> **Q.     The records, though, are 100 percent consistent with what she says;
> correct?**
>
> **A.     They appear to be.**

M. Gonzalez Dep. at 160 (Supp. App. at 23) (emphasis added).

> Q.     So in terms of consistency, those Chinese employees are very consistent,
> aren't they?
>
> A.     They appear to be.
>
> Q.     They were consistent in what they told the investigator.  They were
> consistent in the time records they put down.  They are consistent in their
> sworn statements.  Correct?
>
> A.     You are correct.

M. Gonzalez Dep. at 150 (Supp. App. at 21).  Investigator Gonzalez's first explanation for why

she thinks all Chinese employees lie—that it was "based on the records"—was knowingly false.

2.   Investigator Gonzalez Claimed Surveillance Supported Her Conclusions; It Does Not.

Next, Investigator Gonzalez claimed she relied on "surveillance" to conclude all Chinese servers lie and really work twelve hours a day, six days a week.  M. Gonzalez Dep. at 70 (Supp. App. at 7).  This claim is equally unsupported and troubling.  The surveillance Investigator Gonzalez claimed confirmed Chinese servers worked six days a week, twelve hours a day ***lasted part of one morning!***  M. Gonzalez Dep. at 179-80 (App. at 26).  It did not encompass both arrival and departure times on even a single day—and included a lunch break:

Q.   And that surveillance is for how long, ma'am?

A.   Probably about the same time.

Q.   So the morning?

A.   Yes.

Q.   Did you watch what happened in the afternoon?

A.   We went to lunch and came back.

Q.   Did you stay until close?

A.   No.

Q.   Did you see when people left at the end of the day?

A.   No.

Q.   Did you have surveillance more than one day?

A.   No.

M. Gonzalez Dep. at 179-180 (Supp. App. at 26).

Q.   How late did your surveillance go on the day that you indicate you had limited surveillance of the King Buffet?

A.   Until we entered the establishment.

Q.   All right.  And then no surveillance thereafter; is that correct?

* * *

A.   That is correct.

Q.   So you don't know what time those employees left, do you?

A.   We did not witness it.

> Q.    And you didn't watch to see who came in to serve between the lunch and the dinner hours, did you?
>
> A.    The lunch, after lunch and dinner, no.

M. Gonzalez Dep. at 93-94 (Supp. App. at 11-12). She never stayed to observe the afternoon lull.

It is very hard to understand concluding every Chinese employee lied and worked twelve hours a day, inconsistent with what one sees at other restaurants, contrary to their time records and overriding their own consistent statements, without even staying to see the afternoon lull, yet that is what Investigator Gonzalez did. Investigator Gonzalez did not even take enough care to identify employees she allegedly witnessed during her mini-surveillance. M. Gonzalez Dep. at 59, 62-63, 160-61 (Supp. App. at 5-5A, 23).

In fact, Investigator Gonzalez's surveillance _**contradicts**_ her claims, rather than supporting them. Investigator Gonzalez could not identify any employees present during her surveillance other than those on her list. M. Gonzalez Dep. at 102 (Supp. App. at 14). The problem? The number of employees documented by the Department is inconsistent with Investigator Gonzalez's claim that all employees work twelve hours a day, six days a week:

> Q.    And just to be clear, for the math to work, six-sevenths of the 11 employees have to be there at all times, correct, for your math to work?
>
> A.    Correct.
>
> Q.    And six-sevenths of 11 is 9.4; correct?
>
> * * *
>
> A.    It's close.
>
> Q.    All right. And there were only seven employees there when you were there; correct?
>
> A.    Right. Well --
>
> Q.    You can't identify any more than the seven, can you?
>
> A.    Not at this point, but that doesn't mean they weren't there.
>
> Q.    You have no record of any more being there, do you?

A.      Just because we didn't interview every single employee doesn't mean they weren't there.[1]

Q.      You understand that it's your burden of proof in this case; correct?

A.      Yes, I understand what you're saying.

Q.      Right.  And you can't identify any employees who were there other than the seven that you either interviewed or tried to interview that day; correct?

A.      Correct.

M. Gonzalez Dep. at 99-100 (Supp. App. at 13).

Q.      And, in fact, your visit to the Mongolian Buffet also did not find the number of employees that would be necessary to support your claim that they all worked six days a week, 12 hours a day, did it?

A.      No.

M. Gonzalez Dep. at 177 (Supp. App. at 25).   Although the Department conducted its "surveillance" and interviews at a peak meal period when one would expect to find the *most* employees present, the Department actually found too few employees present to support Investigator Gonzalez's dramatic theory.  M. Gonzalez Dep. pp. 99-100, 177 (Supp. App. at 13, 25).  Far from surveillance supporting Investigator Gonzalez's claims, it rebuts them despite her failing to stay through the afternoon lull when fewer employees would be expected.[2]

---

[1] The Department also documented anyone who declined to be interviewed.  (App. at 1587).

[2] Investigator Gonzalez's report also is incorrect regarding the surveillance conducted.  Trying to claim King Buffet's surveillance supported her claim, Investigator Gonzalez referenced Exhibit D-23f in her King Buffet report.  (App. at 12)  Beyond this document not remotely supporting *any* claim, it does not pertain to King Buffet.  (SEC. APP'X 96)  It is for Mongolian Buffet.  (*Id.*)  Despite investigators claiming they documented everything (SEC. APP'X 63), nothing shows *any* surveillance at King Buffet.  It appears Investigator Gonzalez never did the King Buffet surveillance she claimed.

3. Investigator Gonzalez Claimed Interviews Supported Her Conclusions; They Do Not.

Investigator Gonzalez next claims she concluded all Chinese servers must be liars and everyone worked 72 hours a week based on interviews. M. Gonzalez Dep. at 91-92 (Supp. App. at 11). Specifically, Investigator Gonzalez claims she concluded "everyone" worked the same hours because Spanish-speaking kitchen employees told her so. M. Gonzalez Dep. at 70 (Supp. App. at 7). Investigator Gonzalez wants to say the Spanish-speaking employees told her what hours the Chinese employees worked, *yet she did not ask them*:

Q.     Did you ask, what about this employee?
A.     No.
Q.     Did you do that for any of them?
A.     No.

M. Gonzalez Dep. at 198 (Supp. App. at 28). Nor, was there evidence the Spanish speaking employees, even knew who the Chinese employees were:

Q.     Do you know if they even knew their names, ma'am?
A.     No, they did not know their names.

M. Gonzalez Dep. at 106 (Supp. App. at 15). Indeed, the only employees available confirm they cannot identify a single Chinese employee. (App. at 76-77, 82-84, 89-90)

Admitted falsehoods in Investigator Gonzalez's report make her purported reliance on unsupported hearsay even more troubling. For example, Investigator Gonzalez concluded: "Based on the information gathered through the interviews of the Spanish-speaking employees, it was determined that the Chinese employees [at King Buffet] were receiving check and cash payments for their hours worked." (App. at 10) Given the lack of evidence the two groups even could

communicate,[3] Defendants asked how Spanish-speaking employees knew how Chinese employees were paid:

> Q.     How did the Spanish-speaking employees know any Chinese employee was receiving cash compensation?
>
> A.     Sight.  Based on sight.

M. Gonzalez Dep. at 74 (Supp. App. at 8).  Despite Investigator Gonzalez so stating both in her report and under oath, no Spanish-speaking employee *ever* told Investigator Gonzalez King Buffet's Chinese employees were paid cash.  M. Gonzalez Dep. at 85-87 (Supp. App. at 9-10).

> Q.     And this is the third and final Spanish-speaking employee you interviewed at King Buffet; correct?
>
> A.     Yes.
>
> Q.     And this also indicates that he told you nothing about how the Chinese-speaking employees were paid at King Buffet; correct?
>
> A.     Correct.
>
> Q.     So, indeed, you said in your report that the Spanish-speaking employees told you how the Chinese employees were paid; but that's not borne out by the statements you took, is it?
>
> A.     Yes.

M. Gonzalez Dep. at 87 (Supp. App. at 10).

Perhaps even more troubling, after *already* testifying she knew Chinese King Buffet employees were paid cash because Spanish-speaking employees saw it, when confronted with her claim's falsity, Investigator Gonzalez, without batting an eye, simply changed her story.  M. Gonzalez Dep. at 77 (Supp. App. at 8) ("I didn't say they were paid in cash.").  That testimony, likewise, proved false.  M. Gonzalez Dep. at 77 (Supp. App. at 8) ("Apparently I did.").  Only when completely cornered did Gonzalez admit her report was just false:

> Q.     So your report is wrong.  Your report --

---

[3] M. Gonzalez Dep. at 74 (App. at 8).

> A.   Yes.  Yes.
>
> Q.   So what you said in your report is not accurate; correct?
>
> A.   No, no, no.  I – You're correct.  It does – The way it reads, you're absolutely correct.

M. Gonzalez Dep. at 89 (Supp. App. at 10).

> Q.   So now we have the Chinese employees telling you one thing, and it turns out the Spanish-speaking employees didn't tell you anything different about the Chinese-speaking employees, but you still rejected what the Chinese-speaking employees told you; correct?
>
> A.   Correct.

M. Gonzalez Dep. at 89 (Supp. App. at 10).

Further, unlike Chinese employees Investigator Gonzalez chose to disbelieve, who are wholly consistent not only with their signed time sheets but each other, Investigator Gonzalez chose to rely on employees who repeatedly contradict each other and themselves.  For example, Ms. Andrade claims she was a server inexplicably working 72 hours a week.  G. Andrade Dep. at 12 (App. at 82).  Mr. Paredes, one of Investigator Gonzalez's few witnesses who can be found, insists Ms. Andrade was clearly a part-time employee.  E. Paredes Dep. at 9 (App. at 75). Investigator Gonzalez's response is telling and compelling.  Investigator Gonzalez insists Mr. Paredes could not possibly know Ms. Andrade's hours because he works back in the kitchen and "couldn't see the front of the house."  M. Gonzalez Dep. at 222 (Supp. App. at 30).  It is these same kitchen workers (including, specifically, Mr. Paredes!), who now suddenly cannot even *see* the servers, on whom Investigator Gonzalez simultaneously relies to claim all Chinese servers are liars.  Pl. Stmt. of Add'l Facts ¶ 17(d).  When kitchen workers say a Latino server did *not* work 72 hours a week, they were shielded from seeing the front of the restaurant and could not know.  When those same cooks say a Chinese server, who they cannot identify and with whom they share no

common language, worked 72 hours a week, all Chinese employees are liars for saying otherwise. Such is the view of Investigator Gonzalez on whom the Government relies.[4]

### C.   <u>The Department's Factual Statement Is Misleading.</u>

This is not a criminal case where there is a legal duty to reveal exculpatory evidence, but the Eighth Circuit Court of Appeals made clear:

> It is the duty of the United States and its attorneys, when engaged in litigation, or, indeed, in any dealings with citizens, not just to win the case, but to see that justice is done.

*Celestine v. Veterans Admin. Hosp.*, 746 F.2d 1360, 1362 (8th Cir. 1984), *abrogated on other grounds by, McNeil v. U.S.*, 113 S.Ct. 1980, 1983 (1993). The Government, consistent with its mission, should reveal weaknesses in its evidence. *Id.* Here, however, the Government repeatedly omits extremely material facts from what it tells this Court. For example, the Department relies on a Chinese employee's statement to suggest, "One of the servers stated she received her pay in cash each day."[5]  Resistance at 12. (SEC APP'X 140)  To avoid misleading this Court, however, it would seem appropriate to reveal the employee *had not even yet worked a week* and, thus, only would have received tips to date. (SEC APP'X 140)  The Department tried to redact this information ("I started here ████ ago"), but failed to catch the second time the employee stated, "I've been here

---

[4] Investigator Gonzalez also claims that, although she says they could not see the front to know when servers worked, did not know their names and did not speak the same language, perhaps the Spanish-speaking employees would know what the Chinese employees did because maybe they all arrived at the same time. M. Gonzalez Dep. at 161 (Supp. App. at 23) ("if they arrive at the same time"). Putting aside that this would not tell the cooks in the back if someone left when serving slowed down, consistent with the pattern in this case, Investigator Gonzalez knows her claim to be false.  She watched employees arrive.  Indeed, too few employees arrived *at all* for Investigator Gonzalez's story to be true, and they did not arrive together.  (Supp. App. at 123)

[5] The relevance of even this is hard to fathom given that she also indicated nothing to suggest she was not paid in full and confirms, yet again, a server's part-time schedule.

- 13 -

only a week." *Id*.  Investigator Gonzalez knows it would not be unusual for an employee who had

worked as a server less than a week to have only been paid tips.  M. Gonzalez Dep. at 66 (Supp. App.

at 6).

The Department also misleadingly invokes Emanuel Paredes.  When using Mr. Paredes to

claim employees were hidden in a warehouse to avoid interviews, the Department could have

revealed that Mr. Paredes identified the number hidden as, "Like, five.  Two, three -- Seven."  E.

Paredes Dep. at. 24 (Supp. App. at 41).  Beyond wildly gyrating, Mr. Paredes's claim of seven

people hiding in a warehouse makes no sense.  The Department interviewed 12 people, including

Annie and Henry, on March 6, 2014, when it conducted its unannounced interviews at Mongolian

Grill.  (Supp. App. at 124)  The Mongolian Grill only employed 17 people, including Annie and

Henry.  (App. at 31)  Even under the Department's theory, some employees would have been off

work that day.  (App. at 30-38) (concluding employees work six days per week).  Indeed, if one

accepts the Department's theory, one-seventh of the employees, or 2.43 employees, would be off

on any given day.  Thus, Mr. Paredes's testimony that seven employees ran outside and hid in a

warehouse next door simply is not possible—there were not that many people employed by the

restaurant.

Similarly, the Department notes, "In his deposition, Emanuel Paredes testified he worked

six days per week from 10:00 a.m. to 11:00 p.m., but he initially told Wage and Hour he worked

from 10:30 a.m. to 9:30 p.m. **because of Zheng's instructions**."  (SEC APP'X 131)  The

Department likewise knows this to be false—but failed to tell the Court.  Mr. Paredes initially

claimed Henry gave him a note telling him to lie (E. Paredes Dep. at 22 ("He gave me a list."))

(Supp. App. at 41)  This required a note so he changed his story to claim, "He only told me," (E.

Paredes Dep. at 23 (Supp. App. at 41)).  Mr. Paredes and Henry speak different languages, so Mr.

Paredes claimed a conversation in "English, Spanish and sign language," (E. Paredes Dep. at 23

(Supp. App. at 41)), only then to realize the timing ***still was impossible***.  The critical fact the Government omits in claiming Mr. Paredes "initially told Wage and Hour he worked from 10:30 a.m. to 9:30 p.m. ***because*** of Zheng's instructions," is Mr. Paredes ultimately claims his interaction with Henry, whatever he may ultimately claim it was, occurred ***after*** his conversation with the Department.  E. Paredes Dep. at 28 (Supp. App. at 42).  Thus, even under Mr. Paredes's fluid story, his contradictory initial statement literally could not have been "**because of Zheng's instructions**" as the Department told this Court.  (*Id.*)

The Department also tells this Court twice (Resistance at 8, 11) that Defendants must not be believable because Ricky Lu said he did not have certain conversations with Annie and Henry. Putting aside that Defendants do not rely on Annie and Henry in seeking summary judgment, the Department also failed to tell this Court Mr. Lu did ***not*** work with Annie and Henry:

> Q.   You don't personally do any of the work for Mongolian Buffet or King Buffet, do you?
>
> A.   No.

R. Lu Dep. at 57 (Supp. App. at 36).  Before insinuating something nefarious from Annie and Henry not speaking to Mr. Lu, the Department should have alerted this Court that they never could or did converse ***because they do not speak the same language***:

> Q.   And do you speak Chinese, sir?
>
> A.   No, I don't.
>
> Q.   Okay.  So, in fact, you didn't have any personal conversations with Mr. Zheng or Ms. Li, did you?
>
> A.   No, I did not.
>
> Q.   In fact, was part of the reason for that the language barrier that you described?
>
> A.   Yes.
>
> Q.   As far as you know, they speak Chinese, correct?

A       Yes.

R. Lu Dep. at 59 (Supp. App. at 36).  Indeed, Mr. Lu confirmed he had no personal knowledge of

*any* conversations that actually occurred with Annie and Henry about cash payments:

> Q.       And so in terms of any conversations about cash payments to employees
> that either King Buffet or Mongolian Buffet, you would not personally
> have had those conversations with either, would you?
> A.       No, I would not have.
> Q.       And you, personally, in other words, would not have, correct?
> A.       Personally, no.

R. Lu Dep. at 60-61 (Supp. App. at 36-37).  The Government fails to tell this Court that Mr. Lu

lacks required personal knowledge—while claiming he provides evidence.

        One of the Department's claims, however, is perhaps even more troubling because it is so

misleading and so clearly incorrect.  The Department tells this Court just one or two servers

typically are shown working at Mongolian Grill in late 2012, throughout 2013 and into early 2014.

Resistance at 9.  They note this number is fewer than they believe worked at King Buffet, which

makes no sense because King Buffet is smaller.  *Id.*  From this, they again conclude all Chinese

employees (but not Caucasian employees who say the identical thing) are lying when they say they

worked part-time.  Defendants agree the Department's numbers make no sense, but that is because

the Department, again, is wrong.  The Department relies on a chart, apparently created in

Investigator Gonzalez's investigation, provided at Appendix pages 832 and 833.  Although not

labeled, the Department apparently claims the second page shows servers at Mongolian Grill in

2012, 2013 and 2014.  It is extremely easy to identify those serving at Mongolian Grill during each

pay period because pay stubs show who worked as a server by reflecting tips.  It appears the

Department did not look, however, because the numbers the Department supplied to this Court are

wrong:

|  | DOL's Claimed Number of Servers Working at Mongolian Grill | Actual Number of Servers Working at Mongolian Grill as Reflected on Pay Stubs |
|---|---|---|
| Dec-12 | 2 | 6 (App. at 244, 245, 517, 518, 565, 566, 1554; Supp. App. at 47-48, 77-78) |
| Jan-13 | 1 | 5 (App.at 246, 1555, 567, 247, 1556, 568; Supp. App. at 49-50, 79-80) |
| Feb-13 | 2 | 4 (App. at 569, 570, 605, 1557, 1558; Supp. App. at 51-52, 81-82) |
| Mar-13 | 2 | 5 (App. at 571-72, 607, 1559-60; Supp. App. at 53-54, 83-84) |
| Apr-13 | 3 | 5 (App. at 573-575, 608, 1370-71, 1561-63; Supp. App. at 55-57, 85-87) |
| May-13 | 2 | 6 (App. at 576-77, 1372-73, 1564-65; Supp. App. at 58-59, 88-89) |
| Jun-13 | 2 | 5 (App. at 578-79, 1374-75, 1566-68; Supp. App. at 60-61, 90-91) |
| Jul-13 | 2 | 5 (App. at 580-81, 1376-77, 1569-70; Supp. App. at 62-63, 92-93) |
| Aug-13 | 2 | 5 (App. at 1378-79, 582-83, 1571-72; Supp. App. at 64-65, 94-95) |
| Sep-13 | 2 | 5 (App. at 586-89, 1382, 1575-76, 1578; Supp. App. at 66-68, 96-97) |
| Oct-13 | 1 | 4 (App. at 591-92, 1580-81; Supp. App. at 69-70, 98-99) |
| Nov-13 | 1 | 4 (App. at 593-94, 1582-83; Supp. App. at 71-72, 100-01) |
| Dec-13 | 1 | 4 (App. at 595-96, 1584-85; Supp. App. 73-74, 102-03) |
| Jan-14 | 1 | 4 (App. at 597-98, 1586; Supp. App. at 104-05) |

Anywhere from two to five *times* as many servers were working at Mongolian Grill than the Department told this Court.

### D.    The Department's Investigation Negates Its Conclusions.

Contrary to Investigator Gonzalez's conclusions that all employees (except the Caucasian employees discussed below) worked twelve hours a day, six days a week, Investigator Gonzalez's investigation repeatedly indicates the opposite. Although she did not stay to observe the afternoon lull, Investigator Gonzalez knows there are typical times of day restaurant patrons eat. M. Gonzalez Dep. at 24-25 (Supp. App. at 3). Investigator Gonzalez knows such patterns cause ebbs

and flows in restaurant workloads. M. Gonzalez Dep. at 25 (Supp. App. at 3). She knows cooks

and servers typically have different work demands. M. Gonzalez Dep. at 26-27 (Supp. App. at 4).

She knows servers routinely have varying schedules with some working only over lunch and some

only the evening meal period. M. Gonzalez Dep. at 105 (Supp. App. 14). Time records in this

case reflect exactly what would be typical. (App. at 18, 125-144, 180-194, 221-237, 271-285, 314-

328, 357-371, 400-414, 443-457, 486-487, 489-494, 507-508, 510-516, 532-558, 602-603, 609-

624, 656-672, 708-709, 816, 827, 868-871, 901-904).

> Q.     And this person whose statement is B-7 says they worked 11:00 to 2:00 each day and wrote down the time they arrived; correct?
>
> A.     Yes.
>
> Q.     And, actually, in your experience as somebody who has been in lots of restaurants auditing them, somebody working the lunch shift is not at all unusual, is it?
>
> A.     It's not.
>
> Q.     And yet you assumed that this person was not telling the truth when they said that; correct?
>
> A.     Correct.

M. Gonzalez Dep. at 203-204 (Supp. App. at 29). Significantly, the existence of part-time

schedules fits the number of employees Investigator Gonzalez actually could identify as present

during her investigation. M. Gonzalez Dep. at 99-100, 177 (Supp. App. at 13, 25). The existence

of part-time schedules fits the employee who reported receiving a break. M. Gonzalez Dep. at

119-20 (App. at 107-08; Supp. App. at 16).[6] The existence of part-time schedules fits the staffing

---

[6] Expressing a desire to be "consistent," Investigator Gonzalez chose to disregard information from that an employee received a one-hour break even though she does not take a position one way or another on whether the employee actually had a break. M. Gonzalez Dep. at 119-20 (Supp. App. at 16).

typical for a restaurant this size.  (Supp. App. at 125-43).[7]  More importantly, part-time schedules fit what servers ***consistently told Investigator Gonzalez's investigators***.  M. Gonzalez Dep. at 150 (Supp. App. at 21).

Indeed, although she concluded, contrary to their sworn statements, every Chinese employee worked 72 hours per week, Investigator Gonzalez knows and accepts employees worked part-time—just not Chinese employees who she concludes are all lying:

> Q.  So, again, it appears without any real doubt that servers are working part time at Mongolian Buffet; correct?
>
> A.  That some may be.

M. Gonzalez Dep. at 229-230 (Supp. App. at 31-32).

> Q.  So yet again we have confirmation for people that you believe are accurate who were working as part-time servers; correct?
>
> A.  Yes.

M. Gonzalez Dep. at 232 (Supp. App. at 32).  Indeed, Investigator Gonzalez accepted that Kristi Reed, Paulina Markiewicz, Jessica Lucky and Minda Kramer all worked part-time.  M. Gonzalez Dep. at 226, 229-30, 231, 237 (Supp. App. at 31-33).  Each of them is white.  L. Li Decl. at ¶ 2 (Supp. App. 38).  The Department did not even interview all these witnesses yet somehow determined *their* time records are accurate and *they* were paid properly. M. Gonzalez Dep. at 226 (Supp. App. at 31) (Kristi Reed); M. Gonzalez Dep. at 229-230 (Supp. App. at 31-32) (Paula Markiewicz); M. Gonzalez Dep. at 231 (Supp. App. at 32) (Jessica Lucky); Gonzalez Dep. at 237

---

[7] For its part, the Government never looked at staffing trends or statistics before concluding these restaurants must have had more employees than the work ever could justify.  M. Gonzalez Dep. at 108 (App. 15).

(Supp. App. at 33) (Minda Kramer).[8]  Investigator Gonzalez also believed a Latina employee who

said she was part-time.  M. Gonzalez Dep. at 232-233 (Supp. App. at 32).

> Q.   So back to the part-time employee question, can you identify any Latino or
> Caucasian employees where you did not accept that they had worked a part-
> time schedule when the record showed that?
>
> A.   Not at this point.

M. Gonzalez Dep. at 240 (Supp. App. at 34).   Although Investigator Gonzalez accepted that

Caucasian and a Latina employee worked part-time and were correctly paid, she rejected the exact

same information if provided by Chinese employees:

> Q:   And you accepted [Jessica Lucky's] signed representations while rejecting
> every Chinese employee's representations about part-time status; correct?
>
> A:   I accepted her information, yes.
>
> Q:   While rejecting every Chinese employees' representations?
>
> A:   I think I answered that question many times.
>
> Q:   And the answer was yes every time, wasn't it?
>
> A:   Yes.

M. Gonzalez Dep. at 231 (Supp. App. at 32).

In reaching her conclusion, Investigator Gonzalez not only disregarded what is typical for

restaurants and everything Chinese employees reported, she disregarded every time sheet servers

contemporaneously signed to verify their hours.  M. Gonzalez Dep. at 107 (Supp. App. at 15).

---

[8] Investigator Gonzalez now claims she did not know all employees whose part-time employment she accepted were white (or Latino).  This claim lacks credibility.  Investigator Gonzalez knows Ms. Kramer, Ms. Lucky, Ms. Reed and Ms. Markiewicz did not have Asian names and those interviewed spoke English.  M. Gonzalez Dep. at 226, 229-231 (App. at 3).  She also knows, if you have an Asian name, she concluded you lied—even without talking to you.  M. Gonzalez Dep. at 232 (Supp. App. at 32).  Investigator Gonzalez provides no explanation for why these four employees with Caucasian surnames were not included in the Department's request for back wages.  In any event, these employees plainly show Investigator Gonzalez knew employees worked part-time, yet chose to conclude any employee with an Asian surname was lying if they said the very same thing.

Neither the Department nor Investigator Gonzalez explains why records for Caucasian employees _all_ were accepted as true while records for Chinese employees _all_ were rejected as false even when the employee confirms, under oath, the Department is wrong.

## **ARGUMENT**

This case involves the Court's critical role as a check on other government branches' power; as a brake on government overreach and abuse. Courts ensure fairness to all—not just one race or another. Courts can prevent the government from believing or disbelieving someone based on color of skin and insist on caution when decisions break down 100% on racial lines.

> [C]ourts are not required to stay their hand when the government unfairly marshals its immense power against selected citizens. Regulatory or enforcement decisions based on personal dislike, vendetta, or some other impermissible consideration, are anathemas to the American tradition honoring the rule of law. Accordingly, the federal and state constitutions do not permit regulatory and law enforcement decisions to be based on certain impermissible considerations. These impermissible considerations include race, gender, religion, or some other arbitrary classification such as the exercise of statutory or constitutional rights.

_421 Corp. v. Metro. Gov't of Nashville & Davidson County_, 36 S.W.3d 469, 480 (Tenn. Ct. App. 2000) (internal citations omitted). Here, the Government asks this Court strike down basic protections and ignore fundamental elements of proof because it says Annie and Henry are bad. The Department's plea calls to mind Justice Brandeis's admonition from many years ago:

> Experience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding.

_Olmstead v. United States_, 277 U.S. 438, 479 (1928) (Brandeis, J. dissenting). The Department's zeal to prove its case cannot eliminate elements of proof or negate the federal rules.

In resisting summary judgment, the Department (1) misunderstands summary judgment standards, (2) misunderstands what constitutes evidence for summary judgment purposes and (3)

fails to recognize Defendants did *not* seek summary judgment on all claims so evidence regarding claims on which summary judgment is *not* sought is immaterial. Defendants seek summary judgment for Chinese employees[9] Li Rong Chen, Quing Wen Chen, Xiao Qui Chen, Lian Fang Dong, Li Xiang Gao, Ai Mei Li, Jia Rong Li, Ling Quan Li, Sheng Wang Li, Si Tong Li, Xiang Jin Li, Xiu Feng Li, Xue Quin Li, Xue Qin Li, Zeng Xing Li, Zhao Shui Li, Lan Lin, Liang Pan, Ping Wang, Wen Qiang Wang, Di Wu, Bi Jiang Zhang, Qui Ying Zhang, Shi Zhao Zheng and Xiu Ying Zhu.[10] The Department's lead investigator confirms, in her independent unannounced interviews, *all* Chinese employees disavow her accusations on their behalf:

> **Q.**   **Well, in fact, every one of the employees with a Chinese name disavowed what you're claiming; correct?**
>
> **A.**   **Yes.**

M. Gonzalez Dep. at 167 (Supp. App. at 24) (emphasis added). Thus, the issue is this simple: Can the Department recover on behalf of employees who consistently, in every possible form and venue, deny they are owed anything?

Notably, the question is not whether a representative action could proceed. Representative actions, like class actions, typically allow a party to opt out. The question more accurately is, even if a representative action is allowed, can the Department recover for those who expressly,

---

[9] The Department did not pursue back wages on behalf of any Caucasian employee at all, so they are not included as part of this Motion.

[10] Defendants also are skeptical of claims as to the employees not included in the request for summary judgment. These employees signed time records contradicting what they now claim. They then testified differently still. E. Paredes Dep. at 28 (Supp. App. at 42) (changing his story yet again in his deposition). Defendants' skepticism increases when employees claim no breaks, yet pictures show them napping during breaks. (App. at 101-104)  Contrary to what the Department seems to believe, however, that is *not* the subject of Defendants' Motion. Def. Br. at 5. If the Department can produce witnesses to testify they worked while napping, perhaps a factual dispute prevents summary judgment. The question in this Motion is whether the Department can recover for those who categorically insist they did *not* work by calling them liars.

repeatedly and adamantly disavow claims on their behalf.  Case law makes clear it cannot.  *Reich v. S. Maryland Hosp., Inc.*, 43 F.3d 949, 952 (4th Cir. 1995) (not allowing recovery to employees who testified they never missed lunch); *Solis v. State of Washington Dep't of Soc. & Health Servs.*, 2016 WL 879166, at *5 (W.D. Wash. Mar. 8, 2016) (employer entitled to summary judgment against Department as to non-testifying employees who indicated employer paid them properly); *Chao v. Westside Drywall, Inc.*, 709 F. Supp. 2d 1037, 1059-60 (D. Or. 2010) (representative witness theory does not allow Department to recover for employees who specifically state they are not owed back wages).  It surely cannot do so based on race.  By now, it is beyond dispute that Defendants are "entitled to individualized determinations of each employee's eligibility for backpay." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 369 (2011).  If a party did not actually suffer a loss, it cannot recover. *Tyson v. Bouaphakeo*, 136 S.Ct. 1036, 1043-44 (2016).  Even when a representative action is allowed, it does not become a license to allow recovery for those who attest they were not harmed.  To put it in perhaps the starkest terms, Investigator Gonzalez does not have the right to make Annie's mother sue Annie because Investigator Gonzalez believes all Chinese people lie.[11]

## I.   THERE IS NO BASIS TO DENY SUMMARY JUDGMENT BASED ON UNAUTHENTICATED DOCUMENTS.

Defendants will start where the Department is correct.  Although perhaps honored only in the breach in Iowa, the Rules provide exhibits should be authenticated.  The Department, however, is mistaken that the remedy is to deny summary judgment, when the omission is corrected.  The opposite is true. *E.g., Semaan v. IGT*, 126 F. App'x 794, 795-96 (9th Cir. 2005) (finding no abuse

---

[11] Indeed, the Department seeks to compel multiple relatives, including Annie's mother, to sue Annie and Henry for over $200,000.  (App. at 119-20).

of discretion where district court considered exhibits after party cured its initial failure to verify the exhibits); *E.E.O.C. v. Fred Meyer Stores, Inc.*, 954 F. Supp. 2d 1104, 1117-18 (D. Or. 2013), *on reconsideration in part* (Sept. 19, 2013) (accepting exhibit with supplemental authentication declaration); *Manuele v. City of Jennings*, 2012 WL 113538, at *13 (E.D. Mo. Jan. 13, 2012) (denying motion to strike exhibits after party authenticated in supplemental pleadings); *Nolan v. Thompson*, 2007 WL 148815, at *1 (W.D. Mo. Jan. 16, 2007), *aff'd,* 521 F.3d 983 (8th Cir. 2008) (denying motion to strike where defendants subsequently authenticated exhibits); *Tracy v. Financial Ins. Mgmt. Corp.*, 458 F. Supp. 2d 734, 737–38 (S.D. Ind. 2006) (same).  Defendants have provided affidavits.  Further, Defendants seek summary judgment based on the complete lack of evidence as to for Li Rong Chen, Quing Wen Chen, Xiao Qui Chen, Lian Fang Dong, Li Xiang Gao, Ai Mei Li, Jia Rong Li, Ling Quan Li, Sheng Wang Li, Si Tong Li, Xiang Jin Li, Xiu Feng Li, Xue Quin Li, Xue Qin Li, Zeng Xing Li, Zhao Shui Li, Lan Lin, Liang Pan, Ping Wang, Wen Qiang Wang, Di Wu, Bi Jiang Zhang, Qui Ying Zhang, Shi Zhao Zheng and Xiu Ying Zhu. Defendants can demand summary judgment on this issue without documents.  *Chao*, 709 F. Supp. 2d at 1070-71 ("Defendants need only point out the absence of evidence to support the Secretary's case to prevail at summary judgment.").  To defeat summary judgment, the Department had to come forward with real evidence as to these specific employees that it admits expressly disavow its position.  It provides none.

## II.   THERE IS NO BASIS TO STRIKE AFFIDAVITS FROM THE DEPARTMENT'S OWN WITNESSES.

Next, the Department professes unfair surprise that Chinese employees came forward to disavow the Department's claims.  This claim is remarkable.  How can there be a proper claim of surprise when *the Department listed each and every employee who submitted a statement as a witness?*  (Supp. App. at 124)  **IN FACT, IT SEEKS RECOVERY FOR EACH OF THEM**!

For the Government to claim these employees were unknown to it or it is surprised it needed to prove they were harmed, when it makes claims on their behalf, is frivolous. Nor can the Government claim it is surprised these employees disagree with it. It knew all these employees insisted it was wrong when it chose to make claims on their behalf. M. Gonzalez Dep. at 167 (Supp. App. at 24). All that appears to come as a surprise to the Department is that Defendants did the work the Department should have, but did not, in actually speaking to witnesses.

Nor is it correct that Defendants must update the Government moment by moment, in defending a case, when it secures statements proving the Government wrong. The work product doctrine protects the process of gathering witness statements. *See, e.g., 1100 West LLC. v. Red Spot Paint & Varnish Co., Inc.*, 2007 WL 2904073, *2 (S.D. Ind. May 18, 2007) (stating "documents created by Mr. Dunn (or any other agent of Plaintiff or its counsel) during the course of this litigation that reflect which potential witnesses Mr. Dunn has interviewed ... are classic work product; so, too, are the affidavits that Mr. Dunn drafted summarizing his understanding of the witnesses' statements. It is frankly perplexing that the Defendant would suggest otherwise"); *Lamer v. Williams Communications, LLC*, 2007 WL 445511 at *2 (N.D. Okla. February 6, 2007) ("The affidavits at issue are work product and were prepared after commencement of the action; thus ... they are protected from production absent special circumstances"); *Stokes v. City of New York*, 2006 WL 2064976 at *2 (E.D.N.Y. July 24, 2006) ("There is no question that the affidavit in question, which was drafted, in part, by counsel for defendants, was prepared in anticipation of litigation as a substitute for a deposition. ... Affidavits and other witness statements prepared or obtained in anticipation of litigation are generally entitled to protection under Rule 26(b)(3)."); *Kintera, Inc. v. Convio, Inc.*, 219 F.R.D. 503, 510 (S.D. Cal. 2003) ("witness statements 'would not have been generated but for the pendency or imminence of litigation,' and are accordingly

protected as fact work product"). Work product, of course, can selectively be waived. *Pittman v. Frazer*, 129 F.3d 983, 988 (8th Cir. 1992) ("[D]isclosure of some documents does not destroy work product protection for other documents of the same character.") (quoting C. Wright and A. Miller, Federal Practice and Procedure § 2024 (1994)). Defendants could have gathered all these statements AFTER the close of discovery and used them. It could have withheld them entirely. The problem most assuredly is not Defendants' conduct, but that the Department chose to pursue claims on behalf of witnesses it knew contradicted its claims at every turn presumably hoping Defendants would not find them.

The Department's argument merely highlights its abusive conduct. To this day, the Department refuses to provide complete employee statements. Indeed, it provides complete statements only of those who *accuse* Annie and Henry. The Department purportedly invokes the informant's privilege to withhold names and other information from statements, yet redacted identifying information only for those who insist the Government is wrong! Does the Government really think Annie and Henry, who no longer employ anyone, would retaliate against those who *support* them? Privilege may not be used as a sword and a shield. *Perez v. Los Arcos Seafood & Grill, Inc.*, 2016 WL 1029519, at *7 (M.D. Tenn. 2016) (Department of Labor could not admit employee declarations after invoking the informant's privilege until shortly before trial because "[s]uch a use of the privilege would act as a shield and a sword under these circumstances."); *see also U.S. v. Workman*, 138 F.3d 1261, 1264 (8th Cir. 1998); *United States v. Beltramea*, 2015 WL 5320881, at *6 (N.D. Iowa Sept. 11, 2015). Yet, that's what the Department does. Further, the Department even appears to have redacted exculpatory information that could not identify *anyone*:

> I did record the number of hours that I worked on a sheet of paper at the front desk. I recorded the hours myself. I believe that the other ▮▮▮▮▮ employees recorded their hours as well. My hours recorded were correct, and I was paid for those hours.

(App. at 112)  So, when some employees say "everyone" works the same hours, it becomes fact. When a different employee says others record their own time, it becomes redacted.  What is the possible basis for such a redaction other than the "damaging to our case" privilege?  Because the Department redacted exculpatory evidence, Defendants were forced to locate the remaining witnesses to confirm what they already told the Department—that Investigator Gonzalez is wrong. To now suggest Defendants cannot even do that lacks merit.

### III.    THE DEPARTMENT IGNORES SUMMARY JUDGMENT STANDARDS AND RULES.

Finally, and perhaps most importantly, the Department simply does not meet its burden to resist summary judgment.  Summary judgment is a defendant's opportunity to put a plaintiff to its proof.  *Seldon v. Wal-Mart Stores, Inc.*, 174 F. Supp. 2d 991, 995 (W.D. Mo. 2001) ("The main purpose of a motion for summary judgment [] is to identify factually unsupported claims.  If a plaintiff has the burden of proof at trial on a claim and the defendant has filed a motion for summary judgment, the plaintiff must identify admissible evidence sufficient to make a submissible case at trial.") (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).  To defeat summary judgment, a party may not merely sit on its allegations.  Here, that means the Department must present real, admissible evidence that Li Rong Chen, Quing Wen Chen, Xiao Qui Chen, Lian Fang Dong, Li Xiang Gao, Ai Mei Li, Jia Rong Li, Ling Quan Li, Sheng Wang Li, Si Tong Li, Xiang Jin Li, Xiu Feng Li, Xue Quin Li, Xue Qin Li, Zeng Xing Li, Zhao Shui Li, Lan Lin, Liang Pan, Ping Wang, Wen Qiang Wang, Di Wu, Bi Jiang Zhang, Qui Ying Zhang, Shi Zhao Zheng and Xiu Ying Zhu worked hours for which they were not paid.  Instead, it identifies literally nothing as to any of them.  Indeed, in response, the Department repeatedly ignores basic summary judgment rules.

## A.   Immaterial Allegations Do Not Defeat Summary Judgment.

Only disputes on materials issues can defeat summary judgment. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1052 (8th Cir. 2011) ("[A] disputed fact alone will not defeat summary judgment, rather there must be a genuine issue of ***material*** fact.") (emphasis added).   Here, the Department repeatedly offers evidence it thinks shows Latino employees worked six days a week, twelve hours a day.   For example, the Department argues, "Li admitted to filling out the timesheets for all Spanish-speaking employees."   (SAMF ¶ 32a).   It is impossible to see the relevance when "Defendants do not seek summary judgment on the Department's claims for back wages for Spanish speaking employees."   (Def. Br. at 5).[12]   Despite very serious issues rebutting any claim the Spanish-speaking employees went without breaks throughout the day and serious contradictions in their testimony, *Defendants did not seek summary judgment as to any of them*. A plaintiff may not resist summary judgment by presenting alleged disputes as to *a different claimant* and the evidence is not material.   *See Hamelin v. Faxton-St. Luke's Healthare*, 274 F.R.D. 385, 391-92 (N.D.N.Y. 2011) (finding the plaintiff's submission of payroll records of numerous employees to raise issues of fact was irrelevant to disputed plaintiffs and could not defeat partial summary judgment).   Similarly, the Department argues signed time slips verifying hours "only mean something if the employee knew what he or she was signing."   Resistance at 10.   The Department promptly forgets it has no evidence any of the employees subject to this Motion claim they did not understand what they signed.   *Not one*.   Quite the opposite, the Department admits all employees subject to this Motion confirmed their hours *were* correct and there is no evidence to

---

[12] It is hard to understand the import of this claim even as to Spanish-speaking employees when, regardless of who completed the records, every employee signed to verify their hours.

rebut their time slips.   Trying to create a factual issue with regard to employees for whom

Defendants did not seek summary judgment is misleading.

>    **B.      Alleging Two Chinese Employees Lie Does Not Show All Chinese
>             Employees Lie.**

The Department next tries to convince this Court that Annie and Henry are bad and

dishonest.   After arguing Annie and Henry are bad, the Department then, yet again, suggests all

Chinese employees who say the same thing as Caucasian employees must be lying—while

accepting identical facts from every Caucasian employee.   Defendants, however, literally rely on

_no_ testimony from Annie and Henry.   Instead, they rely on the employees themselves that the

Department agrees all disavow the Department's allegations.   M. Gonzalez Dep. at 167 (Supp.

App. at 24).   Guilt by association long has been rejected by our judicial system.   *United States v.*

*Polasek*, 162 F.3d 878, 884–85 (5th Cir. 1998)**.**   This is doubly true when the association at issue

is skin color.   *United States v. Diffoot*, 54 M.J. 149, 150 (C.A.A.F. 2000) ("We hold that trial

counsel's closing argument referring to appellant's alleged co-conspirators' Hispanic ethnicity and

admitted criminality, and urging conviction based on the theory of guilt by association,

prejudicially violated appellant's due process right to a fundamentally fair trial.").   Investigator

Gonzalez does not claim the white employees, Ms. Kramer, Ms. Reed, Ms. Markiewicz and Ms.

Lucky, are lying.   How can she claim all Chinese employees are lying when they say the same

thing?   Ethnic generalizations do not substitute for real evidence.   *United States v. Nobari*, 574

F.3d 1065, 1075 (9th Cir. 2009).   No witness identifies any of the employees at issue in

Defendants' Motion being threatened, cajoled or misled in any way.   None works for Annie or

Henry anymore.   Where, then, is the evidence from any of them of any underpayment or any

coercion to deny it.

Suggesting two Chinese parties are bad does not allow the Government to reject every other Chinese employee's statement—while accepting identical facts from Ms. Kramer, Ms. Reed, Ms. Markiewicz and Ms. Lucky.  Indeed, one can only wonder why there is not an equal inference that Annie and Henry favor all Chinese employees and pay them proper wages instead of the inference that all Chinese employees lie.  *See Jianjun Fu v. Wells Fargo Home Mortgage*, 2014 WL 4681543, at *4 (N.D. Ala. Sept. 12, 2014) ("While normally courts must construe inferences in favor of the non-movant at the summary judgment state, the court cannot do so here because when evidence points equally to inferences that are favorable and to inferences that are unfavorable to the moving party, i.e., the party seeking the inference, the evidence lacks probative value; and the evidence may not be used to support on inference over another because such use is more conjecture and speculation.") (internal marks omitted).

*Infowise Sols., Inc. v. Microstrategy Inc.*, 2004 WL 2870637, at *2–3 (N.D. Tex. Dec. 10, 2004) (concluding non-moving party was not entitled to inference and granting partial summary judgment because non-moving party was "not claiming entitlement to a rational inference from the record before the Court, but only speculation upon surmise upon inference").

### C.    The Government's Failure to Secure Evidence Is Not Evidence.

The Government also seems to suggest undue influence by Defendants somehow prevented it from securing evidence.  Consistent with its pattern, the Department offers absolutely no evidence of undue influence toward Li Rong Chen.  Or Quing Wen Chen.  Or Xiao Qui Chen.  Or Lian Fang Dong.  Or any other party for whom Defendants actually sought summary judgment. No witness can identify any of the employees at issue being threatened, cajoled or misled in any way.  In any event, the Department misunderstands.  To defeat summary judgment requires the Department to have evidence, not excuses for failing to secure it.  *Pathmark Stores, Inc. v. Gator Monument Partners, LLP,* 2009 WL 5184483, at *10 (E.D. Penn. Dec. 21, 2009); *Finizie v. Peake,*

548 F. Supp. 2d 171, 179 (E.D. Pa. 2008) *aff'd sub nom. Finizie v. Shineski*, 351 F. App'x 668 (3d Cir. 2009).  The Department had the entire discovery period to secure evidence.  It cannot resist summary judgment by blaming anyone else for its failure.  *Finzie*, 548 F. Supp. 2d at 179.

### D.    The Department May Not Invoke Witnesses Lacking Personal Knowledge.

Another basic rule is that those upon whom a party resisting summary judgment relies must have personal knowledge.  Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.");  *see Brooks v. Tri-Sys., Inc.*, 425 F.3d 1109, 1111 (8th Cir. 2005) (finding the district court properly ignored affidavit where the content and context of the statements in the affidavit did not support an inference that it reflected the affiant's personal knowledge); *Early v. Bankers Life & Cas. Co.*, 1995 WL 528013, at *5 (7th Cir. Sept. 5, 1995) ("Testimony about matters outside affiant's personal knowledge is not admissible in an affidavit used to support or resist the grant of summary judgment.");  *Ways v. City of Lincoln*, 206 F. Supp. 2d 978, 980 (D. Neb. 2002).   Here, the Department relies on Mr. Lu's testimony that he had no conversations with Annie and Henry— implying this also means nobody else did.  Resistance at 8, *see* at 11.  Mr. Lu could not, and did not, ever speak to Annie and Henry.  He lacks personal knowledge on the topic for which the Department invokes him and admits it.  Non-evidence cannot defeat summary judgment.[13]

---

[13] The Department seems to believe Mr. Lu's lack of personal knowledge is overcome because a third party provided him as a 30(b)(6) witness.  This is directly contrary to the law.  *See Brazos River Auth. v. GE Ionic, Inc.*, 469 F.3d 416, 435 (5th Cir. 2006) (plaintiff could introduce deposition testimony of witness produced pursuant to Federal Rule of Civil Procedure 30(b)(6) against defendant who produced the witness, but could not introduce the testimony against a co-defendant because the witness failed to satisfy the personal knowledge requirements of Federal Rule of Evidence 602).

E.   **Claiming Evidence Will Someday Materialize Is Anathema to Summary Judgment.**

The Department then claims, although it may not have evidence yet, perhaps it will at trial. Indeed, the Department turns the law on its head to claim summary judgment must be denied precisely because it has _**not**_ come forward with evidence. Resistance at 6 ("But this is an issue for trial, as the parties have not disclosed their list of trial witnesses, so Defendants cannot know what the Secretary's representative sample will be."). Few principles are better established than that it is improper to resist summary judgment by claiming the resisting party may come up with unidentified evidence at trial. *Barge v. Anheuser-Busch, Inc.*, 87 F.3d 256, 260 (8th Cir. 1996) (plaintiff could not resist defendant's motion for summary judgment "simply [] on the hope of discrediting the movant's evidence at trial," and is not permitted to "manufacture a genuine issue of material fact by merely hoping, without coming forward with any evidence ... that the trier of fact may disbelieve [defendant's summary judgment evidence]."); *Poole v. Gillison*, 15 F.R.D. 194, 198 (E.D. Ark. 1953) (purported need to visit with declarants, and conjecture that defendant's negligence was possible, was not sufficient to defeat summary judgment in "mere hope" that "additional evidence may develop at or prior to trial" to support plaintiff's claim). To resist summary judgment, the Department needed to come forward with real evidence—not a suggestion it might have some in the future. *Solis*, 2016 WL 879166, at *5 (holding the Department of Labor cannot "merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim."). Nor can the Department rely on its hope to discredit all the Chinese employees at trial to show they are owed money they insist they are not.[14]

---

[14] *Walton v. McDonnell Douglas Corp.*, 167 F.3d 423, 428 (8th Cir. 1999) ("[T]o defeat summary judgment, Walton must present affirmative evidence, not simply contend a jury might disbelieve MDC's evidence."); *Lauth v. Covance, Inc.*, 2016 WL 3269043, at *14 (S.D. Ind. June 14, 2016) ("[A]bsent evidence that shows a witness's testimony is false, speculation that the witness is lying

Beyond being contrary to the Rules, the Department's claim again is less than forthcoming with the Court. Defendants asked the Department if it even could find purported witnesses. It cannot. (Supp. App. at 144-50); *see* M. Gonzalez Dep. at 159 (Supp. App. at 23). Thus, the Department tells this Court maybe it will present evidence in the future without informing the Court it cannot even find the witnesses today. Remarkably, the Department lacks even a single witness for the King Buffet. *Id.*; (App. at 93-100). Discovery is closed and the deadline for summary judgment is here. Hoping a witness will materialize is no basis to resist summary judgment. *Solis*, 216 WL 879166, at *5; *Poole*, 15 F.R.D. at 198.

### F.      Generalizations Do Not Overcome Evidence.

Finally, the law could not be clearer that generalizations do not defeat summary judgment. *Wyoming v. Oklahoma*, 502 U.S. 437, 464 (1992) ("A plaintiff cannot, however, on the basis of the same generalizations, obtain or avoid summary judgment...."); *Holland v. Sam's Club*, 487 F.3d 641, 644 n.5 (8th Cir. 2007) (finding "general conclusory, and cursory statements "were insufficient to defeat summary judgment"); *Lang v. Intel Corp.*, 1997 WL 199959, at *2 (9th Cir. 1997); *Manning v. University of Chicago*, 401 F. Supp. 2d 858, 865 (N.D. Ill. 2005) ("generalizations, without factual support in the record, are insufficient to defeat summary

---

cannot be used to defeat summary judgment."); *Wang v. United States*, 2015 WL 7283134, at *3 (E.D. Wis. Nov. 17, 2015) ("[A] party may not defeat a motion for summary judgment by suggesting that one of the defendant's witnesses may be lying."); *BFI Waste Sys. of N. Am. LLC v. Freeway Transfer, Inc.*, 867 F. Supp. 2d 1037, 1047 (D. Minn. 2012) ("The mere possibility that a witness's trial testimony will not be believed is never a sufficient reason to deny a summary judgment motion premised on that testimony."); *Fernandez v. China Ocean Shipping (Grp.) Co.*, 312 F. Supp. 2d 369, 378 (E.D.N.Y. 2003), *aff'd sub nom. Fernandez v. China Ocean Shipping (Grp.) Co.*, 94 F. App'x 866 (2d Cir. 2004) ("Merely '[t]o assert that [a] witness[] may be lying, without any evidence to contradict the witnesses' testimony cannot defeat a motion for summary judgment.") (quoting *Brown v. Johnson & Johnson Consumer Prods.*, 1994 WL 361444, at *4 n.3 (S.D.N.Y. July 11, 1994)); *Laven v. Flanagan*, 695 F. Supp. 800, 812 (D.N.J. 1988) ("It is not sufficient for plaintiff to merely contend that defendant's affidavits may be untruthful – if that were the sole basis to defeat a motion for summary judgment, then none would ever be granted.").

judgment"); *Davis v. City of Springfield*, 2007 WL 627407, at *1 (C.D. Ill. Feb. 26, 2007) ("generalizations cannot be used as evidence to overcome summary judgment"); *Aurel v. School Bd. of Miami-Dade County Pub. Sch.*, 261 F. Supp. 2d 1375, 1379 (S.D. Fla. 2003) ("generalizations are insufficient to defeat a Motion for Summary Judgment"). Specific evidence must be produced to resist summary judgment. *Wyoming*, 502 U.S. at 464; *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007); *Parks v. City of Horseshoe Bend, Ark.*, 480 F.3d 837, 839 (8th Cir. 2007).

> Needless to say, unsubstantiated assertions are not competent summary judgment evidence. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. *See Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir.), *cert. denied*, 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994).

*Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

What are those specific facts as to employees at issue *in this Motion* who uniformly and consistently disavow the Department's claims and have done so at every opportunity? What is the evidence when the Department accepted identical facts when provided by Caucasian employees? What evidence was offered as to Jai Rong Li or any other employee for whom Defendants seek summary judgment? Is it the suggestion "everyone" works the same hours—when the Department knows that is not true?

> Q. So yet again we have confirmation for people that you believe are accurate who were working as part-time servers; correct?
>
> A. Yes.

M. Gonzalez Dep. at 232 (Supp. App. at 32). Ultimately, generalizations that "everyone" or "no one" did something simply cannot overcome the word of the employees themselves that they did not work the hours alleged. In *Abbondanzo v. Health Mgmt. Sys., Inc.*, 2001 WL 1297808, at *6 (S.D.N.Y. Oct. 25, 2001), *aff'd*, 36 F. App'x 3 (2d Cir. 2002), for example, a witness testified that

"no one else" got warned for those things for which he got warned. Such a generalization, without specific evidence, however, could not overcome the testimony of those with direct knowledge. *Id.*; *Surrell v. California Water Serv. Co.*, 2006 WL 464079, at *8 (E.D. Cal. Feb. 27, 2006) (alleging other minority candidates were overlooked, without identifying them, was not evidence to defeat summary judgment), *aff'd*, 518 F.3d 1097 (9th Cir. 2008); *Argo v. Blue Cross & Blue Shield of Kansas City, Inc.*, 452 F.3d 1193, 1200 (10th Cir. 2006) (upholding District Court's refusal to consider plaintiff's "everyone" affidavit in resistance to motion for summary judgment that "no female Individual Enrollment Specialists was [*sic*] terminated during my employment for failing to make monthly or yearly goals" when plaintiff could only remember the names of seven female co-workers, was unsure why the females he could name left the company, and was a coworker rather than human resources employee who would have personal knowledge). This basic proposition is doubly true when the witnesses providing the generalizations do not know the employees' names M. Gonzalez Dep. at 106 (Supp. App. at 15), could not say what day they worked, E. Paredes Dep. at 12-15; G. Andrade Dep. at 13-18; L. Moreira Dep. at 14-21 (App. at 76-77, 82-84, 89-90), and, when the need arises, claim they could not know the facts because they could not see the front of the restaurant, M. Gonzalez Dep. at 222 (Supp. App. at 30).

## IV.   THE DEPARTMENT CANNOT SIMPLY DECIDE TO DENY THE TIP CREDIT.

Even if there were evidence, which there is not, that back wages were owed to tipped employees, the tip credit must be applied across all hours worked, not only those reflected on the employee's paystubs. The FLSA provides just two conditions for an employer to take the tip credit: (1) the employer must inform the employee that the employee will be paid a reduced minimum wage; and (2) all tips received must be retained by the employee unless pursuant to a

valid tip pool. 29 U.S.C. § 203(m). Both are met here.[15] The Department seeks to add a third—which is that all other wages properly were paid. Under this rationale, the tip credit vanishes whenever there is a wage dispute. The Department cites no cases because this simply is not consistent with the law.

In an effort to distract from the lack of case law supporting its position, the Department challenges Defendants' citation. The Department's challenges miss the mark. The point of the cases Defendants cite is that the tip credit is only disallowed where no notice is given or the tips were not retained by employees in violation of Section 203(m). *Martin v. Tango's Rest., Inc.*, 969 F.2d 1319, 1321 (1st Cir. 1992), *as amended* (July 31, 1992) (denying tip credit solely for failure to provide tip-credit notice); *Chao v. Min Fang Yang,* 2007 WL 7209596, at *3 (W.D. Tenn. Aug. 13, 2007) (same). Indeed, where notice was given and employees retained their tips as required by Section 203(m), courts recognize that any unpaid wages should be reduced by the tip credit:

> All employees who are not paid for every hour worked have a remedy. However, for tipped employees that remedy is not recovery of the difference between the reduced and full minimum wage. Instead, the remedy is recovery of the wages the employee was entitled to in the first place. Those wages are payable at the reduced minimum wage rate provided for in section 203(m) of the FLSA.

*Goldin v. BoceGroup L.C.*, 773 F. Supp. 2d 1376, 1380 (S.D. Fla. Mar. 29, 2011); *see also Vancamper v. Rental World, Inc.*, No. 6:10-CV-209-ORL-19, 2011 WL 1230805, at *11 (M.D. Fla. Mar. 31, 2011) (recognizing back wages would be reduced by any tip credit employer was

---

[15] The Department now claims for the first time that perhaps the two statutory prerequisites were not met but it simply allowed the tip credit to be claimed out of kindness. Resistance at 15-17. The Department presents *no* evidence of a material dispute of fact on whether the two statutory elements are met. Indeed, quite to the contrary, paystubs clearly reflect the tip credit (*see, e.g.,* App. at 157-74, 372-84), and employees confirm they kept their tips (*see, e.g.,* G. Andrade Dep. at 9 (App. at 38a); (App. at 55-58)).

entitled to claim).  Tipped employees can only recover what they would have earned in the first instance, not the full minimum wage as the Department calculates.

## V.   THE DEPARTMENT APPEARS TO CONCEDE ITS DAMAGES DEMAND WENT OUTSIDE THE LIMITATIONS PERIOD.

The Department demands damages "for the period March 5, 2012 to March 24, 2014, and in such further amounts as the Court may find due after March 24, 2014." (Complaint at 5).  The Department now appears to agree that it sought damages outside the limitations period.  It also may be claiming, however, that the statute of limitations should run for three years before suit was filed.  The Department did not seek summary judgment and any finding of willfulness is very much in dispute.  Thus, to the extent the Department seeks some declaration that a three-year limitations period governs this claim, there is no basis to reach such a conclusion on the record here.

## CONCLUSION

For the foregoing reasons and for all those reasons previously stated, summary judgment is required for employees who disavowed the Department of Labor's position

Respectfully submitted,

BELIN McCORMICK, P.C.

By _____

James R. Swanger
Michael R. Reck              *Lead Counsel*
Kelsey J. Knowles

666 Walnut Street, Suite 2000
Des Moines, IA  50309-3989
Telephone:  (515) 283-4645
Facsimile: (515) 558-0645
E-mail:    jrswanger@belinmccormick.com
           mrreck@belinmccormick.com
           kjknowles@belinmccormick.com

ATTORNEYS FOR DEFENDANTS

CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served
upon the parties to this action by serving a copy upon each party
listed below on August 11, 2016, by

✓ Electronic Filing System          Other _____

M. Patricia Smith
Christine Z. Heri
H. Alice Jacks
Traci Martin
United States Department of Labor
Office of the Solicitor
Two Pershing Square Building
2300 Main Street, Suite 1020
Kansas City, MO  64108

Signature: _____